1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10

## WESTERN DIVISION

11

| DONOVAN WAKEFIELD FARWELL, | ) | |
|---|---|---|
| 12 | Plaintiff, | ) ) ) | Case No. 08-004438 AJW |
| 13 | v. | ) ) | |
| 14 | MICHAEL J. ASTRUE, | ) ) | MEMORANDUM OF DECISION |
| 15 | Commissioner of the Social Security Administration, | ) ) ) | |
| 16 | Defendant. | ) ) | |
| 17 | | ) | |

18
19
20
21

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's applications for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

22

### Administrative Proceedings

23
24
25
26
27

The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation. [See JS 2]. Following administrative hearings in February 2007 and July 2007, the Administrative Law Judge ("ALJ") denied benefits in a September 2007 written hearing decision that constitutes the Commissioner's final decision. [JS 1; Administrative Record ("AR") 17-28]. The ALJ found that during the period from August 1, 2000, plaintiff's alleged date of onset of disability, through December 31, 2005,

28

his date last insured, plaintiff had severe impairments consisting of depression not otherwise specified ("NOS") and opiate[1] dependency. [AR 23; JS 2].   The ALJ further found that plaintiff's impairments, including his opiate dependency, met the criteria for "substance addiction disorder" in section 12.09 of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 23]. The ALJ determined, however, that if plaintiff stopped his substance abuse, he would have the residual functional capacity to perform "simple to moderately complex work" at all exertional levels, and therefore could perform his past relevant work as a box office cashier. [AR 28].  Because the ALJ concluded that plaintiff would not be disabled if his substance abuse stopped, the ALJ denied benefits on the ground found that plaintiff's substance abuse was a contributing factor material to the determination of disability. [AR 28].

### Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

### Discussion

### Substance abuse as a contributing factor material to the determination of disability

A claimant who otherwise meets the definition of disability under the Social Security Act is not eligible to receive disability benefits if drug addiction or alcoholism is a "contributing factor material to the determination of disability."  20 C.F.R. §§ 404.1535(a), 416.935(a).   If the Commissioner finds that the

---

[1]   The terms "opiate" and "opioid" are used interchangeably, as they are in various documents cited in this memorandum.

claimant is disabled and has medical evidence of the claimant's drug addiction or alcoholism, the Commissioner must determine if the claimant would still be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b), 416.935(b); Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied, 128 S.Ct. 1068 (2008).   If a claimant would still be disabled if he or she stopped using drugs or alcohol, the claimant's drug or alcohol addiction is not a contributing factor material to the determination of disability, and benefits may be awarded.  20 C.F.R. §§ 404.1535(b), 416.935(b).

A two-step analysis is required to determine whether substance abuse is a material contributing factor.  The ALJ first must determine which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol, and then must determine whether the remaining limitations would be disabling.  If the remaining limitations are disabling, then the claimant's drug addiction or alcoholism is not a material factor to the determination of disability. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2); Parra, 481 F.3d at 747.

The claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material the disability determination, by showing that he or she would remain disabled if the substance abuse ceased.  Parra, 481 F.3d at 748. Where the evidence of materiality is inconclusive, the claimant's burden of proof is not satisfied.  Parra, 481 F.3d at 749-750 (rejecting the argument that a finding of materiality is precluded unless the medical evidence affirmatively shows that a disability will resolve with abstinence).  To hold otherwise would give an addicted claimant "no incentive to stop" abusing drugs or alcohol, "because abstinence may resolve his disabling limitations and cause his claim to be rejected or his benefits terminated."  Parra, 481 F.3d at 750.

**Factual Background**

According to plaintiff's testimony and the medical evidence, plaintiff was addicted to Vicodin during the 1990s, twice undergoing detoxification. [AR 308, 312, 639, 642].  Plaintiff testified that he had had "a problem with . . . depression all my life and addiction." [AR 639]. He also said that opiate-based prescription medications were more effective at alleviating his depressive symptoms than conventional antidepressants, at least for the first few months he took them. [AR 641, 647, 654, 687-689].

1        In 1997, plaintiff was prescribed Buprenex (buprenorphine hydrochloride).[2]  Dr. Rutland, who later

2 treated plaintiff for Buprenex dependency, said that Buprenex had been used in Europe to treat opioid

3 dependency.[3]  [See AR 312, 641].  During the two years he took Buprenex, an injectable drug, plaintiff

4 became dependent on that drug, prompting him to seek help from Dr. Rutland, a board-certified psychiatrist

5 who also is certified in addiction medicine and addiction psychiatry. [AR 308-309, 623, 641-642, 695-696].

6 When outpatient detoxification failed, plaintiff was hospitalized for inpatient detoxification, which both he

7 and Dr. Rutland described as profoundly difficult. [AR 309, 639-640, 676, 685]. Plaintiff testified that after

8 his July 1999 detoxification he continued on antidepressant medication, but did not use opiates again until

9 2002.  In a February 2001 letter, however, Dr. Rutland, noted that plaintiff had "sustained a few brief

10 relapses on Vicodin" since his July 1999 detoxification.  [AR 309].

11        In a February 2001 letter, Dr. Rutland observed that after plaintiff's July 1999 detoxification, he "was

12 able to function reasonably well on the [antidepressant] Serzone but only with the addition of small amounts

13 of the central nervous stimulant Dexedrine." [AR 309-310].  Dr. Rutland explained that "[t]he use of central

14 nervous system stimulants in addition to antidepressants is a well-documented pharmacological approach

15 to treating refractory depression." [AR 310].

16 _____

17   [2]   Buprenorphine is an "opioid partial agonist," meaning that it is an opioid narcotic analgesic.
Although buprenorphine

18

19         can produce typical opioid agonist effects and side effects such as euphoria and
respiratory depression,  its maximal effects are less than those of full agonists like

20         heroin and methadone.  At low doses buprenorphine produces sufficient agonist
effect to enable opioid-addicted individuals to discontinue the misuse of opioids

21         without experiencing withdrawal symptoms. The agonist effects of buprenorphine
increase linearly with increasing doses of the drug until at moderate doses they reach

22         a plateau and no longer continue to increase with further increases in dose—the
"ceiling effect." Thus, buprenorphine carries a lower risk of abuse, addiction, and

23         side effects compared to full opioid agonists.

24 [JS 3 (quoting U.S. Department of Health and Human Services, Substance Abuse and Mental Health

25 Services Admin., Buprenorphine, http:/buprenorphine.samhsa.gov/about.html)].

26

27   [3]   The Food and Drug Administration ("FDA") never approved Buprenex for the treatment of
opioid dependence in the United States.  See U. S. Dep't of Health & Human Services, Substance

28 A b u s e   a n d   M e n t a l   H e a l t h   S e r v i c e s   A d m i n . ,   B u p r e n o r p h i n e ,
http:/buprenorphine.samhsa.gov/about.html )(last visited July 30, 2009).

In the fall of 1999, about three months after his detoxification, plaintiff lost his union job of 17 years as the "box office manager" at the Greek Theater in Los Angeles. [AR 632-635]. Six months or so later, in March or April 2000, plaintiff began working at the Universal Amphitheater box office, but he quit after three months. He testified that "I just couldn't take it. I was back at the bottom of the rung in the box office, number one, and number two, I was unable to concentrate . . . I was very depressed." [AR 636].

Plaintiff filed a wrongful termination lawsuit against his employer at the Greek Theater. He testified that after he left his job at Universal Amphitheater, he did not look for another job, partly because of the pendency of that lawsuit. Plaintiff received a settlement in that case of approximately $120,000 in 2001. He also received a workers' compensation settlement of about $60,000. [AR 25, 635, 670-671]. Plaintiff testified that once he received those settlements, he and his wife paid off their mortgage, and they decided that plaintiff would stay home and supervise their children, who were 13 and 14 at the time, while his wife went to work. [AR 643-645, 647-648, 657, 678, 681].

In February 2001, Dr. Rutland noted that plaintiff's response to treatment for depression had been "minimal," and that electroconvulsive therapy "and other novel pharmacologic treatments" were being considered. [AR 314]. In 2002, plaintiff consented to a series of electroconvulsive therapy treatments for depression, which eased his symptoms, but only temporarily. [AR 323-441, 443-445, 464, 613, 674-675, 689]. Plaintiff testified that in 2002, he started using opiate painkillers again, notably OxyContin. He testified that it alleviated his depression for several months but then lost its efficacy, at which point he was dependent and could not stop taking it. [AR 642-643, 646-647, 653-654, 676]. Plaintiff said that he initially was prescribed OxyContin for back pain, but he was able to continue obtaining that drug and other opiate painkillers without having to show that he really needed them. [AR 693].

As part of the settlement of his lawsuit against his employer, plaintiff received vocational rehabilitation training. He started a culinary arts program in 2003, after he started taking OxyContin. He quit after about three months because he "couldn't concentrate" or "keep up." [AR 645-647, 671].

Plaintiff continued taking OxyContin in stronger and stronger doses, up to a maximum of 800 milligrams a day, until July 2005, when he suffered a stroke. [AR 178-237, 646-648]. Plaintiff physically recovered from the stroke, but it prompted him to enter a hospital in August 2005 for opiate detoxification. [AR 239-280, 650-651, 676, 680-681]. Hospital records indicate that he was treated for "acute withdrawal

1  from oxycontin, oxycodone and Valium." [AR 239]. While hospitalized, plaintiff was prescribed Subutex

2  to treat his opiate dependence.[4] [AR 239, 649, 656; JS 3]. Plaintiff described Subutex as a "modern

3  Methadone maintenance." [AR 649, 677].

4      Plaintiff was tapered off Subutex during his hospital stay. [AR 239, 256-263]. He was discharged

5  to "Eaton Canyon, an extended  residential treatment program, for management of chemical dependence."

6  [AR 239]. After his discharge, however, he became "very sick" from withdrawal symptoms.  He was again

7  prescribed Subutex, which he was still taking under Dr. Rutland's supervision through the time of the July

8  2007 administrative hearing, some two years later. [AR 649-650, 656-657, 673-674, 698]. Dr. Rutland also

9  prescribed antidepressant medication that helped plaintiff's symptoms "slightly" and reduced his suicidal

10  thoughts. [AR 650, 656-657, 698].  Plaintiff testified that he did not consider himself "clean" while taking

11  Subutex, and that he would not be considered "clean" if he went to a Narcotics Anonymous ("NA") meeting.

12  [AR 651-652]. He said that he attended NA meetings for about six months off and on after his August 2005

13  detoxification, but that he had stopped going. [AR 652].  In January 2006 and May 2006, plaintiff reported

14  to Dr. Rutland that he was staying at a sober living house. [AR 450-451].   By the time of the initial

15  administrative hearing in February 2007, plaintiff was living at home with his wife and children. [AR 630].

16      **Medical opinion evidence**

17      Plaintiff contends that the ALJ erroneously rejected the opinion of Dr. Rutland in favor of the

18  ────────────────────

19      [4]    In October 2002, the FDA approved buprenorphine hydrochloride, marketed in tablet form

20  under the brand name Subutex, and a buprenorphine/naxolone combination, marketed in tablet form
    under the brand name Suboxone, for prescription by physicians to treat opioid dependence in an
    office setting (rather than in a clinic, as in the case of methadone).   The combination of

21  buprenorphine and naxolone in Subuxone decreases the potential for abuse by injection because
    naxolone is a full opioid antagonist, meaning that it has no opioid effects and blocks the effects of

22  opioids; it also does not produce physical dependence or tolerance. The use of buprenorphine and
    buprenorphine/naloxone can trigger opioid withdrawal syndrome, whose signs and symptoms

23  include dysphoric mood, insomnia, and distress or irritability. See U. S. Dep't of Health & Human

24  Services, Substance Abuse and Mental Health Services Admin., Buprenorphine,
    http:/buprenorphine.samhsa.gov/about.html )(last visited June 23, 2009); U. S. Dep't of Health &

25  Human Services, Substance Abuse and Mental Health Services Admin., Center for Substance Abuse
    Treatment, Clinical Guidelines in the Treatment of Opioid Addiction, Treatment Improvement

26  Protocol ("TIP") Series 40 (hereinafter "Clinical Guidelines") at xv-xviii, 1-9 (2004)(available as

27  a link at http://buprenorphine.samhsa.gov/about.html)(last visited June 23, 2009); Physicians' Desk
    Reference, Prescription Drugs Database, 2009 PDR 6632-4000, Suboxone, Subutex (Thomson

28  Healthcare updated February 2009).

1   opinion of a nonexamining medical expert, Dr. Peterson. [See JS 2-7].

2         In general, "[t]he opinions of treating doctors should be given more weight than the opinions of
3   doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v.
4   Chater, 157 F.3d 715, 725 (9th Cir. 1998)); See Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).
5   A treating physician's opinion is entitled to greater weight than those of examining or nonexamining
6   physicians because "treating physicians are employed to cure and thus have a greater opportunity to know
7   and observe the patient as an individual . . . ." Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir.  2001)
8   (quoting Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) and citing Social Security Ruling ("SSR")
9   96-2p, 1996 WL 374188); See 20 C.F.R. §§ 404.1502, 404.1527(d)(2), 416.902, 416.927(d)(2). An
10  examining physician's opinion, in turn, generally is afforded more weight than a nonexamining physician's
11  opinion. Orn, 495 F.3d at 631.

12        When a treating physician's medical opinion as to the nature and severity of an individual's
13  impairment is well-supported and not inconsistent with other substantial evidence in the record, that opinion
14  must be given controlling weight. Orn, 495 F.3d at 631-632; Edlund, 253 F.3d at 1157; SSR 96-2p, 1996
15  WL 374188, at *1-*2. The ALJ must provide clear and convincing reasons, supported by substantial
16  evidence in the record, for rejecting an uncontroverted treating source opinion. If contradicted by that of
17  another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons
18  that are based on substantial evidence in the record.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190,
19  1195 (9th Cir. 2004); Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir.
20  1995).

21        Dr. Rutland said that he saw plaintiff on a "variable" basis from June 1999 through at least December
22  2007. The record contains progress reports from Dr. Rutland for the period June 1999 through December
23  2006. [AR 448-487]. Dr. Rutland also completed a narrative examination report in February 2001, form
24  questionnaires in January 2006 and July 2007, and a December 2007 letter that was submitted to the Appeals
25  Council.  [AR 26, 308-322, 488-492, 612-616, 623, 684].

26        In the February 2001 report, which was addressed to an attorney, Dr. Rutland provided a history of
27  plaintiff's illness, a summary of his treatment, and a diagnostic impression. [AR 308-314].  Dr. Rutland
28  noted that plaintiff had an "extensive and complicated psychiatric history of depression, punctuated by

1   episodic opioid dependency and abuse" [AR 308], and that plaintiff had used Vicodin, alcohol, and cocaine.

2   [AR 311-312]. He diagnosed plaintiff with major depressive disorder, severe, recurrent, and opioid

3   dependence, episodic. [AR 313]. Dr. Rutland noted that plaintiff initially consulted him in 1999 for

4   Buprenex dependency. Among other things, Dr. Rutland opined that plaintiff's "primary condition is

5   depression because he clearly had depressive symptomatology prior to any use of substances or prescription

6   analgesics," and that plaintiff "actually functioned better while using the opioid medications for many years

7   until he developed tolerance and physical dependency on them." [AR 313].

8       In January 2006, shortly after plaintiff's date last insured, Dr. Rutland completed a "Mental Disorder

9   Questionnaire Form." [AR 318-322, 488-492[5]]. Dr. Rutland stated that plaintiff had "a long history of

10   incapacitating depression that he has self-medicated episodically with opiates." [AR 488]. He noted that

11   plaintiff was on "Subutex 2 mg daily.[,] to restart antidepressant post detox." [AR 492]. Plaintiff's

12   diagnoses were major depression and opiate dependency. [AR 492].

13       On July 23, 2007, about a week before a supplemental administrative hearing conducted by the ALJ,

14   Dr. Rutland completed a "Mental Impairment Questionnaire" giving plaintiff a diagnosis of major

15   depression. Dr. Rutland did not list a diagnosis of opioid dependency or a history of opioid dependency;

16   however, he checked boxes indicating that plaintiff exhibited numerous "signs and symptoms," including

17   "substance dependence." [AR 612]. Dr. Rutland said that plaintiff had a "minimal" response to treatment,

18   which had included "virtually every antidepressant" and a trial of electroconvulsive therapy. [AR 614]. Dr.

19   Rutland rated plaintiff's work-related mental functional abilities in July 2007 as either "fair" or "poor or

20   none." [AR 612-616].

21       On December 28, 2007, Dr. Rutland wrote a letter in response to the ALJ's unfavorable hearing

22   decision. [AR 623]. Dr. Rutland stated that plaintiff "meets the criteria for Major Depressive Disorder,

23   Severe and substance abuse, now free since 08/01/05." [AR 623]. Dr. Rutland opined that plaintiff was

24   "totally disabled," and "given the fact that [he] is dealing with two serious illnesses," he would remain so

25   for at least 18 to 24 months. [AR 623]. Dr. Rutland added:

26       I also believe the usage of drugs is not a material factor in his disability, and that his

27

28       [5]   The record contains two copies of that questionnaire, one of which includes a typed transcript of Dr. Rutland's hand-written responses below the hand-written responses themselves.

1   condition is the same or worse when not using any drugs.  Since [plaintiff] has been on

2   Subutex since his medical detox in August 2005 he has done very well, except for his Major

3   Depressive Disorder which I am continuing to medicate him for. [¶] [Plaintiff] understands

4   that he has a serious psychiatric condition as well as a chemical dependency problem and has

5   actively been seeking help.

6   [AR 623].

7       Dr. Peterson, the medical expert, opined that plaintiff had diagnoses of depressive disorder, not

8   otherwise specified, and opiate use and dependence, in partial remission. [AR 699]. Dr. Peterson testified

9   he could not ascertain from the record that plaintiff ever stopped abusing opiates because there was no

10  objective evidence in the record demonstrating that plaintiff was ever opiate free. [AR 699-703, 706-709].

11  Dr. Peterson opined that plaintiff's opiate dependence was a contributing factor material to plaintiff's

12  disability. [AR 706-709].

13      The ALJ articulated reasons for rejecting Dr. Rutland's opinion that plaintiff stopped using illicit

14  opiates after August 1, 2005, that his condition was "the same or worse when not using any drugs," and that

15  plaintiff's opiate dependence was a contributing factor material to his disability.

16      First, the ALJ pointed to the lack of any objective drug testing in the record that might corroborate

17  Dr. Rutland's assertion that plaintiff had been free of illicit opiates after August 1, 2005 (or at any earlier

18  time) and was disabled by depression alone after that date. [AR 623]. Plaintiff argues that this reason for

19  rejecting Dr. Rutland's opinion is illegitimate because "testing for opiates may not have been feasible" in

20  view of the fact that Subutex "itself is an opiate based" prescription drug. [AR 3]. Plaintiff, however, offers

21  no evidentiary support for the notion that testing for illicit opiates was not feasible while plaintiff was taking

22  Subutex.  To the contrary, Dr. Peterson testified that "[b]est practices in helping someone completely

23  withdraw from opiates would involve physical, objective testing," and that there was insufficient objective

24  evidence to show that plaintiff had been opiate-free. [AR 700-701, 704, 707-709]. Dr. Peterson's testimony

25  is consistent with information in the Clinical Guidelines, which represent "best practice guidelines for the

26  treatment and maintenance of opioid-dependent patients," and which explicitly advise that "*toxicology tests*

27  *for relevant illicit drugs should be administered at least monthly*" to patients who are being treated for

28  opioid addiction with buprenorphine. Clinical Guidelines xv-xvi, 65 (italics added).  Dr. Peterson's

testimony supports the ALJ's conclusion that drug testing was both feasible and appropriate, and that its absence from the record detracted from the reliability of Dr. Rutland's opinion that plaintiff was disabled by depression rather than by depression and opiate dependency.

Plaintiff also argues that as a board-certified psychiatrist and an addiction specialist, Dr. Rutland "would have been aware of whether or not his patient would still be using by observation." [JS 3]. That argument is not persuasive. Dr. Peterson's testimony and the Clinical Guidelines support the conclusion that toxicology tests should be administered to detect illicit drug use in patients undergoing treatment for opioid addiction. In addition, plaintiff saw Dr. Rutland infrequently during the relevant period, at office appointments scheduled in advance. The frequency of those visits was not sufficient to permit systematic close observation of plaintiff.[6] Plaintiff, of course, could decline to schedule or attend an appointment if he chose.

A second reason given by the ALJ for rejecting Dr. Rutland's opinion was that Dr. Rutland gave plaintiff a diagnosis of opiate dependency in January 2006, after his date last insured.[7] Thus, Dr. Rutland's functional assessments reflected plaintiff's condition while opiate dependent, and conversely did not "address what the claimant's functioning would be without the effects of opiate dependency" before plaintiff's insured status expired. [AR 27].

Plaintiff argues that Dr. Rutland assessed plaintiff's functioning absent the effects of opiate dependency, and therefore the ALJ erred in rejecting Dr. Rutland's opinion on that basis. [JS 4-5]. Plaintiff cites assertions made by Dr. Rutland in his 2001 report, namely that (1) Dr. Rutland "had been able to observe the claimant without the use of opiates and [plaintiff] was profoundly and seriously depressed," (2) plaintiff's "primary condition is depression because he clearly had depressive symptomatology prior to any use of substances or prescription analgesics," (3) plaintiff "has actually functioned better while using the opioid medications for many years until he developed tolerance and physical dependency on them," and (4)

---

[6]    According to progress notes in the record, after plaintiff's alleged date of onset in August 2000, plaintiff saw Dr. Rutland for office visits once in 2000, seven times in 2001, three times in 2002, three times in 2003, three times in 2004, twice in 2005, and four times in 2006. [AR 448-487].

[7]    Dr. Rutland also made diagnoses of opiate dependency in August 2003 and July 2004, prior to plaintiff's date last insured. [AR 458, 460].

plaintiff had major depression of long standing independent of "episodic opioid dependency and abuse." [JS 4 (citing AR 309, 313)].

Dr. Rutland's 2001 opinion cannot be reconciled with the record as a whole, including evidence of plaintiff's drug use that postdates that report. To begin with, Dr. Rutland's characterization of plaintiff's drug abuse as "episodic" is belied by the undisputed facts regarding plaintiff's history of drug use. Dr. Rutland noted that plaintiff started using prescription narcotic analgesics in the early 1980s, and Vicodin became his "drug of choice." [AR 311]. After developing tolerance and withdrawal symptoms, he recognized that he had a problem with opiate dependence in the late 1980s. [AR 311-312]. Plaintiff "attended 12-step meetings and made multiple attempts to control or limit his usage on an outpatient basis." [AR 312]. When those attempts failed, he was hospitalized for detoxification from Vicodin in September 1994. He admitted that he was also using cocaine and alcohol. A little more than a year later, plaintiff was hospitalized again for opiate detoxification in January 1996. Plaintiff started Buprenex in 1997 and became dependent on that drug as well, again undergoing inpatient opiate detoxification in June 1999. [AR 309, 312]. Plaintiff testified that he had problems with both addiction and depression his entire life, and that he would stop using opiates "for a while and then I'd start up again . . . ." [AR 639].

Additionally, Dr. Rutland did not have firsthand knowledge of plaintiff's mental condition *before* he began abusing drug because he did not begin seeing plaintiff until June 1999, when plaintiff was in the throes of Buprenex dependence and had a long history of opiate addiction. Prior to February 2001, Dr. Rutland's opportunities to observe how plaintiff functioned without opiates on a sustained basis were limited, at best; plaintiff had already had suffered "a few relapses" on Vicodin in the wake of his July 1999 detoxification. [AR 309]. Dr. Rutland, of course, could not have known in 2001 that plaintiff would soon relapse to serious and prolonged OxyContin abuse and dependency, but that subsequent history further undermines the validity of Dr. Rutland's 2001 assertion that plaintiff's opiate dependency was "episodic" and that depression was his primary disabling condition.

Between the fall of 1999 and the spring of 2000, moreover, plaintiff's depression "appeared gradually to improve" on high doses of Serzone with Dexedrine, and he "stabilize[d] sufficiently" to start working at the Universal Amphitheater box office in the spring of 2000. Plaintiff's depressive symptoms increased after he started working at Universal Amphitheater, but Dr. Rutland said that situational factors, namely "the

stress of his employment situation" at Universal, "was a substantial factor in causing an exacerbation of" plaintiff's depression at that time. [AR 313-314]. Dr. Rutland reported that plaintiff reported "significant stressors at his place of work," and complained of the stress caused by "difficult working conditions and long hours . . . ." [AR 309]. Plaintiff "felt extremely demeaned by working in a demoted capacity." [AR 310-311]. He "obsess[ed] about the situation at work and reported that the job was simply terrible." [AR 311]. Dr. Rutland's statements are consistent with plaintiff's testimony that he quit his job at the Universal Amphitheater box office after three months because he was "back at the bottom of the rung in the box office, number one" and also because he "was unable to concentrate." [AR 636]. When pressed by the ALJ to explain why he could not do the Universal Amphitheater job, plaintiff replied, "Well, I don't know. . . . I don't have an answer why I couldn't do it." [AR 27,  644].

Dr. Rutland reported that after plaintiff left his Universal Amphitheater job in July 2000, his condition "deteriorated to the point where he could no longer work, and he was certified totally disabled in September of 2000, and he has been continually and totally disabled since that time." [AR 311]. As the ALJ pointed out, however, Dr. Rutland did not identify any particular functional restrictions that precluded plaintiff from working at that point in time. [AR 311].

As for plaintiff's mental status in February 2001, Dr. Rutland reported that plaintiff was alert, oriented, cooperative, and in no acute distress. Plaintiff evidenced mild psychomotor retardation.  Eye contact was good. His thought processes were logical, linear, and coherent, without delusions or perceptual disturbances. Plaintiff did not exhibit current suicidal or homicidal ideation or intent. Plaintiff's mood was "markedly dysphoric and depressed." [AR 312-313]. Plaintiff was anhedonic and exhibited low motivation, interest, and enthusiasm. [AR 313]. Animation was diminished.  Affect and affective range were blunted. There was no impairment in reality testing, however, and plaintiff's insight and judgment were intact and appropriate. His sensorium was clear. Plaintiff displayed some short-term memory deficit, some distractability, difficulty with sequential task processing, and difficulty with concentration and focus. [AR 313].

Additionally, Dr. Rutland opined that based on plaintiff's "current situation and limited response to treatment," he is "permanently disabled from any future employment at the level in which he was previously functioning. I believe that his diminished cognition and greatly reduced energy and chronic depressive

symptoms will be permanent and significant limitations on any future employment opportunities." [AR 314].
Dr. Rutland did not specify plaintiff's functional abilities in the event his opioid dependency was completely
resolved.  He did not say that plaintiff was totally unable to work, and failed to identify specific mental or
physical functional limitations.  The ALJ permissibly concluded that Dr. Rutland's February 2001 letter
insufficiently describes plaintiff's functional abilities in the absence of any opiate abuse or dependency.[8]

       The ALJ also noted that Dr. Peterson's testimony was consistent with that of Dr. Kopoian and Dr.
Tashjian. [AR 27].  See Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining
physicians may also serve as substantial evidence when the opinions are consistent with independent clinical
findings or other evidence in the record.").  Dr. Kopoian, a psychologist, examined plaintiff at the
Commissioner's request on January 4, 2006, a few days after plaintiff's date last insured. [AR 283-288].
Dr. Kopoian elicited a history, conducted a mental status examination, reviewed a psychiatric consultation
report from plaintiff's August 2005 hospitalization, and administered psychological tests. [AR 282, 285-
286].

       Furthermore, plaintiff reported that he resided in a sober living facility and performed all activities
of daily living without assistance. He attended an outpatient substance abuse program. He watched

---

[8]   Similarly, Dr. Rutland's later evaluations do not specifically describe plaintiff's functional
capacity without opiate use during the period ending on December 31, 2005. In his January 2006
form evaluation, Dr. Rutland opined that plaintiff had functional restrictions, but he did not
distinguish between the effects of plaintiff's diagnoses of major depression and opiate dependency.
In July 2007, Dr. Rutland completed a form that rated plaintiff's work-related mental abilities. Dr.
Rutland identified only one formal diagnosis on that form, major depression, but elsewhere on the
form Dr. Rutland acknowledged that plaintiff also displayed the "sign or symptom" of "substance
abuse." Dr. Rutland did not specify the functional restrictions that were attributable solely to
depression. [AR 612-616]. In a December 2007 letter that was submitted to the Appeals Council, Dr.
Rutland opined that plaintiff was "totally disabled" due to "two serious illnesses," severe major
depressive disorder and "substance abuse" or "chemical dependency," but he did not describe
plaintiff's functional abilities or distinguish the effects of those two illnesses. [AR 623].
Furthermore, neither Dr. Rutland's July 2007 assessment form nor his December 2007 letter purport
to describe plaintiff's condition before December 31, 2005. That his depression may have worsened
after that point—as plaintiff himself suggested in a March 2008 letter to his social security disability
attorney—does not preclude a finding that his substance abuse was a contributing factor material to
the disability determination through plaintiff's date last insured. [See AR 625 (March 12, 008 letter
from plaintiff stating: "I wonder if it's possible to be retested by one of [the Commissioner's
consultative] doctors. I feel I'm much worse now than I was when I was tested in [January] 2006.")].

television, attended meetings, ran errands, and sometimes shopped for groceries. [AR 285].  Dr. Kopoian did not note any current abnormalities in plaintiff's appearance, behavior, cognition, speech, knowledge, affect, mood, or insight.  Memory was somewhat impaired, in that plaintiff could recall two out of four words after a 20-minute delay and recalled a third word after a category prompt. [AR 284-285].

On the Trailing Making Test, Parts A & B, "a measure of attention and sustained concentration that is sensitive to cognitive impairment," plaintiff scored in the average range for his age. His full scale WAIS-II intelligence quotient was 105 (63rd percentile), with a 95% probability that the range of scores from 101 to 109 represents his true intelligence quotient.  [AR 286]. On the Wechsler Memory Scale-Third Edition, plaintiff scored in the average range on the intermediate auditory section, in the borderline range on the visual immediate memory portion, and in the average range on complex tasks involving sustained concentration. [AR 286].

Dr. Kopoian gave plaintiff an Axis I diagnosis of depressive disorder NOS and opioid dependence, in partial remission.  He opined that plaintiff could understand, remember, and complete simple, two- to-three-sequence tasks without continuous supervision.  Plaintiff was mildly impaired in his ability to perform detailed and complex tasks on the basis of his impaired memory for verbally and visually presented information.  He could perform those tasks with modifications of prompts, use of alternate learning strategies, and time allowances.  Plaintiff's ability to interact with co-workers was mildly impaired.  He could interact with people consistently without exhibiting behavioral extremes in settings with no more than ordinary levels of stress and tension.  He could access public transportation and manage funds without assistance. [AR 287].

Dr. Tashjian, a nonexamining state agency physician, indicated in January 2006 that plaintiff had a severe depressive disorder and a substance addiction disorder in partial remission.  He concluded that plaintiff was not significantly limited in most mental functional abilities and was moderately limited in the ability to understand, remember, and carry out detailed instructions. Dr. Tashjian opined that plaintiff could perform simple, repetitive tasks. [AR 291-307].

Thus, the ALJ articulated specific, legitimate reasons based on substantial evidence in the record for rejecting Dr. Rutland's opinion that plaintiff's substance abuse was not material to plaintiff's disability in favor of the conflicting opinion of Dr. Peterson, which was consistent with other substantial evidence in the

1   record.

2   **Materiality finding**

3   Relying primarily on the ALJ's alleged error in evaluating Dr. Rutland's opinion, plaintiff contends

4   that the ALJ erred in finding that substance abuse was material to the determination of disability. [JS 16-18].

5   For the reasons described above, the ALJ permissibly rejected Dr. Rutland's opinion in favor of the

6   conflicting opinion of Dr. Peterson, which was supported by substantial evidence.  Plaintiff argues that the

7   absence of laboratory tests showing that plaintiff was free of illicit opiates is "immaterial" because there are

8   "numerous records"—referring, apparently, to Dr. Rutland's reports and plaintiff's testimony—showing that

9   plaintiff last used opioids in August 2005.  Plaintiff also argues that his opiate abuse and dependency was

10  not material because Dr. Rutland opined that plaintiff functioned better with opioids than without. [JS 17].

11  As explained above, Dr. Peterson credibly testified that "best practices" in the treatment of opiate

12  addiction entail objective laboratory testing. The ALJ did not err in finding that the absence of any laboratory

13  test results from Dr. Rutland's treatment records greatly diminishes the persuasiveness of Dr. Rutland's

14  assertions that he observed plaintiff during opiate-free periods and that plaintiff functioned better when using

15  opioids than when not using.  Furthermore, Dr. Rutland did not explain what clinical data he relied on, in

16  the absence of toxicology tests, to ascertain that plaintiff was opiate free.  As previously noted, even a

17  practiced observer like Dr. Rutland had very limited opportunities to see plaintiff. Their interactions were

18  largely confined to the structured setting of intermittent office appointments or, very rarely, hospital

19  detoxification programs.

20  Plaintiff argues that his prescription for Subutex after his August 2005 detoxification shows that his

21  opioid dependence was in remission. Dr. Rutland, however, did not say that plaintiff's opioid dependence

22  was in remission.  As late as January 2006, after expiration of his date last insured, Dr. Rutland diagnosed

23  plaintiff with "opiate dependence" and said that plaintiff would start antidepressants "post-detox." [AR 492].

24  Furthermore, the DSM-IV-TR standards preclude a diagnosis of opioid dependence in remission for a patient

25  being treated with Subutex.[9] Dr. Rutland's progress notes from later in 2006 indicate that plaintiff was

26

27       [9]    A diagnosis of substance abuse can be qualified by a "specifier" of early or sustained partial
28  or full remission "only after no criteria for substance dependence or substance abuse have been met
    for at least 1 month," and no remission specifier can be used "if the individual is on agonist therapy

15

having difficulty tapering off Subutex, and he remained on that medication in December 2007. [AR 448-450].

Plaintiff also argues that the consultative examining physician, Dr. Kopoian, did not have the benefit of reviewing Dr. Rutland's records and apparently reviewed only the records of plaintiff's August 2005 detoxification. There is no authority holding that an examining physician must review all of a claimant's medical records, or any opinions rendered by another doctor, in order to for the examining physician's opinion to amount to substantial evidence. See Orn, 495 F.3d at 632 (explaining that an examining physician's opinion constitutes substantial evidence if it is based on independent clinical findings). Furthermore, the ALJ did not rely on solely on Dr. Kopoian's opinion, but also on Dr. Peterson's testimony.

At best, the evidence bearing on the question whether plaintiff's drug addiction was a contributing factor material to his disability was inconclusive. Therefore, the ALJ did not err in concluding that plaintiff had not met his burden to show that his opioid use was not a material factor contributing to the disability determination through December 31, 2005. See Parra, 481 F.3d at 749-750.

**Credibility evaluation**

Plaintiff contends that the ALJ failed properly to evaluate the credibility of plaintiff's subjective symptom testimony. [JS 18-23].

If the record contains objective evidence of an underlying physical or mental impairment that is reasonably likely to be the source of a claimant's subjective symptoms, the ALJ is required to consider all subjective testimony as to the severity of the symptoms.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); See also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated).   Absent affirmative evidence of malingering, the ALJ must then provide specific, clear and convincing reasons for rejecting a claimant's subjective complaints. Vasquez v. Astrue, 547 F.3d 1101, 1105 (9th Cir. 2008); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160-1161 (9th Cir. 2008); Moisa, 367 F.3d at 885.  "In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." Bray v. Comm'r of Social Sec. Admin., 554 F.3d

. . . ."  Clinical Guidelines Appendix C (citing the DSM-IV-TR).

1219, 1227 (9th Cir. 2009); <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir.1997). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." <u>Moisa</u>, 367 F.3d at 885. If the ALJ's interpretation of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ found plaintiff's subjective testimony concerning the period ending on December 31, 2005 "less than fully credible." [AR 27]. The ALJ noted that plaintiff testified that he could perform all activities of daily living without assistance, handle household chores, drive, run errands, and sometimes shop for groceries. [AR 27]. The ALJ added that during the administrative hearing, plaintiff "could not provide a reason for his alleged inability to work." [AR 27]. The ALJ added that plaintiff's credibility was "poor with respect to his opiate use "in light of his prolonged history of opiate dependency and his self-acknowledged return to opiates even after his 1999 detoxification." [AR 27].

During the February 2007 hearing, plaintiff testified that after he received the settlements from the lawsuit against his employer and his workers' compensation case in 2000 or 2001, he "stayed home with the kids for a while" while his wife went to work. He cooked, cleaned, took his children to activities, and helped with school projects. [AR 657, 682-683].

In a disability report completed in October 2005, plaintiff said that he lived in a sober living home with seven other recovering adults. His daily activities included showering, attending a group meeting at a medical center, eating lunch, sometimes taking a nap, talking to his sponsor, going to AA, NA, and other meetings, eating snacks, talking with his housemates, and watching television. He had no problems with personal self care. He had insomnia and sleep problems. [AR 128-132]. Someone had to "dole out" his medications. He was "too tired" to prepare his own meals; instead, he ate out at "fast food, etc." [AR 130]. He did his own laundry and cleaned the bathroom once a week. He had to be reminded to perform his house chores, but he did not need to be reminded to go places. [AR 130]. He went out three or four times a day. He drove. He shopped about once a week for one to two hours for cigarettes and sometimes for clothes. His wife paid the bills, but otherwise he had no problem handling money. [AR 131-132]. He did not "speak much now" with family and friends, and his social activities had "decreased" since his alleged onset of

disability. [AR 133].

In a third party function report completed in October 2005, plaintiff's roommate at the sober living house, Steve Suveg, said that he had known plaintiff for three months. [AR 136]. Regarding plaintiff's daily activities, he wrote that plaintiff bathed, attended AA or therapeutic groups at the hospital, made AA-related buddy calls on the phone, prepared meals, helped with household chores (such as laundry and food preparation), attended AA meetings, rested, read or worked on AA writing assignments, and called his AA sponsor. [AR 136]. Plaintiff had abnormal sleep patterns. Mr. Suveg reminded plaintiff to take his medications and dispensed them. Most days, plaintiff "orders fast food in with other house members," and he rarely helped with house meals. Plaintiff did not prepare meals because he "subsists on donation food which is not very appetizing for him or others in the house." [AR 138]. Plaintiff did laundry, cleaned the bathroom, and cleaned the kitchen once a week. When asked if plaintiff needed help with those chores, Mr. Suveg said, "We all need reminding. No set schedule due to heavy turnover of housemates." [AR 138]. Plaintiff went outside daily by himself and drove a car. [AR 139]. He shopped once a week for about two hours for snack food, clothes, cigarettes and supplies like coffee, cream, and cookies. [AR 139]. Plaintiff watched television, read, and played cards. Plaintiff did not need to be reminded to go places. He attended "many AA functions and meetings with many people" on a daily basis and "participate[d] regularly" in those meetings. [AR 140].

In January 2006, plaintiff told Dr. Kopoian that he was staying in a sober living facility. Plaintiff said that on a typical day, he performed all activities of daily living independently, attended outpatient treatment, watched television, attended meetings, and "may perform several errands." [AR 285].

Standing alone, a claimant's ability to devote part of the day to routine daily activities does not mean that the claimant can perform substantial gainful activity. Vertigan v. Halter, 260 F.3d 1044, 1049-1050 (9th Cir. 2001). The ALJ, however, may consider the performance of such activities in conjunction with other evidence that reflects negatively on the credibility of a claimant's subjective allegations. See Thomas, 278 F.3d at 953, 959 (holding that the ALJ did not err in finding that the claimant's ability to perform chores such as cooking, laundry, washing dishes, and shopping undermined the credibility of her subjective complaints). Plaintiff argues that his October 2005 disability report shows that he needed reminders to perform household chores and take medication, but Mr. Suveg's questionnaire indicates that other

housemates also needed reminders to perform chores because of the frequency of turnover of occupants in the sober living home. The ALJ permissibly relied upon evidence that plaintiff could perform a variety of daily activities as one factor, among others, undermining the alleged severity of his subjective symptoms.

The ALJ also may employ "ordinary techniques of credibility evaluation," considering factors such as the claimant's reputation for truthfulness, inconsistencies within the claimant's testimony, or between the claimant's testimony and the claimant's conduct, a lack of candor by the claimant regarding matters other than the claimant's subjective symptoms, and the claimant's work record  See Light, 119 F.3d at 792; Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989).  Thus, the ALJ was entitled to rely on unexplained inconsistencies or other aspects of plaintiff's testimony that undermined his allegation that he was disabled by depression  irrespective of his opioid abuse or other factors during the relevant period.

During the February  2007 hearing, for example, plaintiff acknowledged that the pendency and timing of developments in the lawsuit against his employer influenced his decision not to look for work after he left his job at Universal Amphitheater, and that he did not work after he received settlements in his employment and workers' compensation cases because he and his wife decided that he would stay home with their children while his wife worked. [AR 643-645]. Plaintiff disagreed with the ALJ's suggestion that "you were functioning okay to work had you wanted to," explaining, "I was surprised at how I was affected by losing my job at the Greek, and I was very depressed about it, and going back to Universal trying to work again, I was unable to do it." [AR 645].  However, when the ALJ asked plaintiff why he didn't "try something else," plaintiff answered, "Well, like I said, the lawsuit was going on at that time, and then once that happened, I did actually try something else, because I had vocational rehab. . . . I went to culinary arts school." [AR 645].  Plaintiff testified that he started taking OxyContin before he started culinary arts school. He asserted that the OxyContin initially "worked well" in alleviating his depression and that he was "very functional at first" on that medication, but he quit school after two or three months and remained on OxyContin for about two and a half years. [AR 646-647].

Referring to the settlement monies plaintiff received, the ALJ later commented, "But that's my point. Since you had that cushion . . . you decided not to even bother to clean yourself up and go look for work. . . . And only after you had the stroke in '05 have you had to start kind of getting back , your feet back under you and moving on." [AR 657].  Plaintiff answered, "Correct, but I haven't been able to, you know, go out

and look for, I mean, I don't know why.  I mean I don't have any proof that I'm depressed.  I don't know how to do it. I mean, whether or not Social Security happens or not, I don't know that it's going to make any difference for me." [AR 657].  During the July 2007 hearing, plaintiff testified that he and his wife paid off their mortgage with the proceeds from the settlements he received. [AR 681]. Plaintiff testified that he had problems sleeping and that his knees bothered him, but he did not have residual problems from his 2005 stroke and was "mostly" back to his normal physical condition. Plaintiff testified that he thought he could walk a mile if he took his time, stand for an hour, sit for two hours, and lift 60 pounds. [AR 680]. Plaintiff agreed that it was "mainly a mental problem" that kept him from working. [AR 681]. Asked by the ALJ why he had not tried to find work, plaintiff replied, "I don't know.  I don't know.  I  ask myself that.  I don't know." [AR 683].  Later, the ALJ said, "So explain to me why if you're physically okay, you haven't tried to do some kind of work somewhere." [AR 686].  Plaintiff answered, "I can't explain that to you.  I'm not trying to be obtuse or anything. . . . I just, I don't know." [AR 686].

Plaintiff contends that the ALJ used leading questions to elicit some of this testimony.  The use of some leading questions by the ALJ does not make his reliance on plaintiff's testimony improper. Plaintiff was represented by counsel during the second hearing in July 2007 and testified consistently (and without objection) about his reasons for not working during both hearings. The record was well developed. Plaintiff has not shown that  the ALJ's conduct of the hearing resulted in any unfairness.

Applying  "ordinary techniques of credibility evaluation," the ALJ also was entitled to question the veracity of plaintiff's testimony about his opioid use during the relevant period in light of plaintiff's prolonged history of opioid dependency and repeated relapses. The ALJ did not disregard evidence that plaintiff had undergone detoxification and made good-faith attempts to free himself of dependency, but that evidence did not compel the ALJ to uncritically accept plaintiff's testimony about the nature or extent of his opioid use.

The ALJ articulated specific, clear, and convincing reasons, based on substantial evidence in the record, supporting his evaluation of the credibility of plaintiff's subjective complaints.

**Lay witness testimony**

Plaintiff contends that the ALJ erred in rejecting the written report about plaintiff's functioning from Steve Suveg, plaintiff's roommate at the sober living facility. [JS 24-26].

1    While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ

2    may discount that testimony by providing "reasons that are germane to each witness." Greger v. Barnhart,

3    464 F.3d 968, 972 (9th Cir. 2006)(quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993)). Germane

4    reasons for rejecting a lay witness's testimony include inconsistencies between that testimony and the

5    medical evidence, inconsistencies between that testimony and the claimant's presentation to treating

6    physicians during the period at issue, and the claimant's failure to participate in prescribed treatment. See

7    Greger, 464 F.3d at 971; Bayliss, 427 F.3d at 1218.

8    The ALJ discussed Mr. Suveg's report. [AR 27-28].  The ALJ acknowledged Mr. Suveg's assertion

9    that plaintiff "battles depression on a daily basis," but he concluded that Mr. Suveg described a "fairly

10   normal" range of daily activities that was inconsistent with debilitating depression. As noted above, Mr.

11   Suveg wrote that plaintiff attended numerous daily recovery meetings and engaged in other therapeutic

12   activities, bathed, performed weekly household chores (on a shared basis with other residents), sometimes

13   prepared meals, shopped, drove a car, read, did writing assignments, watched television, talked to other

14   residents, and played cards. Plaintiff contends that the ALJ's assessment is contradicted by Mr. Suveg's

15   statements that plaintiff rarely helps prepare meals or perform simple tasks. [JS 24].  Mr. Suveg explained,

16   however, that plaintiff and other residents often ordered fast food rather than preparing meals because the

17   donated food available was not appetizing. Mr. Suveg also said that all residents needed reminders to

18   perform chores due to the heavy turnover in the occupants of the house and lack of a set schedule.  That

19   plaintiff may have needed reminders to take his medication is not highly probative of disability.

20   The ALJ articulated germane reasons for giving Mr. Suveg's written report limited weight.

21                                           **Conclusion**

22   For the reasons stated above, the Commissioner's decision is supported by substantial evidence and

23   reflects application of the proper legal standards.  Accordingly, defendant's decision is **affirmed.**

24   **IT IS SO ORDERED.**

25   DATED:  August 4, 2009

26

27   _____

28   ANDREW J. WISTRICH
     United States Magistrate Judge